Okay, the next case is number 2012-5142, CENCAST SERVICES, L.P. v. United States. Mr. Seattle. Thank you, Judge Newman. May it please the Court. This case involves a three-party relationship. Employment tax is in a three-party relationship. You have production companies that retain CENCAST to help it budget, to help it comply with the complex web. I think we understand the fact. Under FUTA, you've got this definition of an employer, which everybody seems to agree would be useful both for FUTA and for FICA, right? Yes, sir. Okay. And the definition of employer is either the person who paid the wages or the person who was in the common law employment relationship, right? There are alternate definitions. That's exactly correct. So why isn't the correct definition of employer depend on which person has been sued by the government as an employer? In other words, in your case, employer would mean aggregator since the government has chosen to sue an aggregator. And if, on the other hand, they'd chosen to sue the common law employer, the definition would be common law employer. The definitions are alternative, Your Honor, and the case law is fairly clear that when a common law employer is not in control of the payment of the wages, the common law employer is not responsible for the collection, computation, and remittance of those taxes. For example, there was a district court case... Yes. ...under the Supreme Court's decision in Ott, but I don't see where in this statute there's a similar provision to the one that was in the Ott case. In other words, I don't see how the common law employer is relieved of liability because it hires an aggregator. Is that your position? Well, Your Honor, I think that is the correct reading of the statute. That's your position? Yes. The common law employer is relieved of liability if it hires an aggregator? Well, you know, I would dispute the term aggregator. What term do you want me to use? I think in this case, you've got a real business that has... Just give me a term. What do you want me to call it? A payroll servicer. If the common law employer hires a payroll servicer, the common law employer is relieved of liability? That's what the case law says, Your Honor. What case law? So, for example, the General Motors case out of the... it's one of the Michigan District Courts. Has the Court of Appeals ever said that? I don't think it's ever been addressed by a Court of Appeals. How could that be, that the common law employer could escape liability by hiring a service company? Well, I don't think it's essential to the issue in the case, Your Honor, but that is what the case law has held. Well, some district court has said that, but it just seems nonsensical. I mean, what a great opportunity for evasion that would be. Well, we're a common law employer, so let's hire a service provider and we don't have to worry about our liability. If I could go to the statute, Your Honor, because I think the statute is really the key to the case. And my focus is on whether my client meets the definition in the limitation, meets the limitation. And I'm looking... Well, let me ask you before you do that. Let's say, hypothetically, Congress decided to really make it a progressive tax system under FICA. And it said, rather than have the cutoff where you pay FICA tax on the first $90,000 or $98,000, we're going to exempt the first $50,000 you pay from any kind of a FICA tax. I presume you would think and assume that the production companies here would be able to consider their payment independently, or would you still be taking the position that no, no, no, no, no, the aggregator, whatever we call them, the payroll tax processor person is therefore not going to be able to derive the benefit from this $50,000 cutoff or exemption. As I understand the statute, the person in my client's position, which is the person in control of the payment of wages, and which doesn't have visibility into who the common law employer is, is the one who calculates the wages and is the one who is responsible for the payment, and that is the person to whom whatever limits or minimums Congress applies. Suppose the government went after the common law employer. The common law employer, it seems to me, would necessarily still be liable. Suppose the service provider went out of business and never remitted the payments to the government. The common law employer is still liable. And then you look at the limit, which is on an employer-by-employer basis, where you are talking about the common law employer, right? Your Honor, whose question should I answer first? Let me come to you, and if I may come back to Judge Crouse. In this case, in this audit, the audit team said maybe we should go after the common law employers. And they went to the national office of the IRS, and the chief counsel said don't do that. That would be novel and aggressive. But that's not the question. The question is they could go after the common law employer, and if they did, the $7,000 limit would be on a per-employer basis, correct? I don't think so. No? How could that not be? I think if you look at the limitation, which is on page A, Romanat 2 of my brief, it says that what's excluded here is remuneration after $7,000. Where are you? Sure, Your Honor. Are you talking about the statutory language? The statutory language, right. Okay, what statutory provision are you talking about? 3306, and then B1, which is the very bottom paragraph on that page. Okay, that's wages, definition of wages. It's the definition of wages, correct. And then there's a series of exclusions, and the one that we're dealing with is the very first one. And the exclusion is once you've paid $7,000 to the employee, remuneration is excluded after that first $7,000 is paid to such an individual. So if you didn't hire a service provider, you're a common law employer, there's a cap, $7,000 per employer, correct? Correct. There's no question about that. Correct. So how can the hiring of a service provider get you out from under that obligation? Because Congress has said that where you have somebody who is in legal control of the payment of wages, and I'm not talking about being an agent where you're just a pass-through, but where you're really the one on the hook. And if, for example, with this government... it means that if you're a common law employer, you don't need to worry about it anymore. Your Honor, why don't we assume, for purposes of the argument, that there would be liability in that hypothetical situation, which is not our situation. But if we assume that there is, it could have been, it might have been, that the IRS decided to go sue the production companies, but they didn't do that. What they said was, we think you're liable to the payroll service company. And when I look at this cap, I say, all right, I've got $7,000 that I've paid to such individuals by such employer. The cap depends, you're saying, on whether they elect to sue the service provider or the common law employer. It's a voluntary compliance system. The answer to that is yes, right? No, I don't think so. Because if they go sue somebody else, I don't care. Right. But if they're suing me... What I'm saying is the way you read the cap is it depends on whom the government chose to sue. If they sue you, it's $7,000. If you sue the common law employer, it's $7,000 per employer. Why isn't that a sensible reading of the statute? He's giving you a note saying that this question actually helped you. Right. He is because he's sitting there and I'm standing here. And he's absolutely right. The common law employer here didn't pay anything. So there is no cap. If you're going to look to the common law employer, there is no cap. They didn't pay anything. All the payments were made by CENCAS. Well, they paid money to CENCAS. After the fact, they reimbursed them in most cases. But the payment, the legal control of the payment of wages is between CENCAS and the employee. And so in that case, if you read employer in that cap to mean common law employer, what you're doing is you're saying you never reached the cap because the common law employer hasn't paid anything. No, but why don't you read the cap provision as depending on who's sued? If they sue the service provider, it's $7,000 for the service provider. If they sue the common law employer, it's $7,000 per employer. Why isn't that the correct reading? Because the statute, Your Honor, doesn't say common law employer. It says employer. It says paid by such employer. Right, but it's paid by such employer. And the common law employer here didn't do any pay. So what you have... Well, they paid CENCAS. They paid CENCAS the amount of wages that it's going to pay out to employees, and they paid CENCAS the amount of tax liability which they owed. The stipulated facts, Your Honor, are that in most cases CENCAS was reimbursed after the fact. Okay, that doesn't change whether they paid them. It's a question of when they paid them, not if they paid them. And in some cases they didn't pay at all. And there is a technical advice memorandum in the record, Your Honor, in which the IRS national office said that fact, the fact that they got paid after, if at all, was material in making them the party in control of the payment of wages and not the common law employer, and that was carried over to the stipulation in the record about page 1830. Was there any consideration of whether this business arrangement of who pays the employee was a matter of convenience, was commercially sound? The government hints that the whole thing was a master plan to achieve breakage and therefore is suspect at the start. Is that an afterthought or is that what's really behind this whole arrangement or this whole case brought by the government? Your Honor, it's an afterthought. There's no question you can see from the amicus briefs, you can see from the expert reports, you can see from the government's admissions in the IRS reports, this was a real business of real substance. The fundamental core value that they delivered was compliance with a web, a very complicated web of collective bargaining agreements that the independent producers didn't have the resources or know-how to comply with. That doesn't seem to be responsive. I think the question is, is your client collecting from the common law employers based on the notion of a $7,000 per employer cap and then remitting to the government on a different basis? The answer to that is absolutely not. First of all, the clients were given alternate invoicing options. One was a flat fee, one was a pro forma with taxes. The taxes were on a per-production basis, not on a per-common law basis. When clients chose that second option, they chose it for their own accounting purposes. You don't have to believe me on that. So the answer is they did pay you more than you remitted to the government? Any business has to, well, no. No? No. Any business has to charge more for its services than it costs to provide them. But there were other fees that were paid in terms of services. This was over and above. I mean, it's not like this is the only remuneration your client got for his services was the difference between the tax paid by the individual production companies and who took off in terms of the aggregate. Right. There were different ways they could do it. They had to get enough to be profitable and to give you some sense of their margin. Put aside the .35 percent, which I understand is part of the remuneration here. Is it not correct that you collected more from your clients than you remitted to the government? Yes, that's correct. Why would that be the business of the IRS? Is this something which the production companies are complaining about? No, not only are they aware of it, Your Honor, but they get rebates at year-end reflecting their volume that they provide to CENCAS. So they're very aware of it. And the point of it is not that these are taxes that they owe that then get passed to CENCAS, that then get passed to the government. The liability is imposed on an employer who pays the wages rather than on the common-law employer, and that was the holding him up. No, that can't be true. It can't be true that the common-law employer escapes liability by hiring a service provider. It must be that the common-law employer is still liable for the tax if the government chooses to go after the common-law employer. I cannot possibly read these statutes as saying, well, you hire a service provider and you reduce your tax automatically. I think the best we can do, Your Honors, is agree that that's not this case, because if it were this case, we'd have to evaluate the statutes in a very different context. Here, we agree, everybody agrees, that CENCAS is liable. And the question is... I don't understand why you say it's not the case. Take off the animus, take off the intent part of it, whether or not they did it for purposes of trying to avoid paying... Right, which there's no evidence in the record that they really did. But just as a factual matter in terms of what the consequences were, then Judge Dyke is absolutely right, and his scenario applies to your case as well. Whether they did it for that intent or not, the fact is that what you are telling us that in this case, with respect to your client, the fact of hiring a service provider allows these common-law employers to escape the tax liability they otherwise would have had under the statute. Well, I don't think so, Your Honor. We know that when it comes to income tax withholding, which is the lion's share of the money that gets remitted, we know that Congress has made an either-or statute... Well, there's a special provision in there, but that provision doesn't exist in FICA and FUTA. And we also... I agree that the provision doesn't exist in the same way, but we also know that Congress chose an either-or scenario for the lion's share of the taxes. So, I don't see why it shocks us if the FICA and FUTA statutes are going to be read in peri materia with the withholding statute. And that was exactly the holding of the Supreme Court in Ott, where the taxpayer argued... It doesn't involve FICA or FUTA, right? I'm sorry? Ott does not involve FICA or FUTA. Oh, it does, sir. There are two pieces of Ott. The first piece was the income tax withholding, and the next piece, the piece that's important here, is that it required FICA withholding as well. And the Supreme Court said, we're not going to read the person who is the employer to be narrower in FICA than we are going to read it in the withholding statute. Narrower. Correct. It doesn't say broader. No, they're reading it to be at minimum... They don't say it's the same. That is true. Although in Rowan, the Supreme Court said, we want these statutes to be read in peri materia. So I think that... I mean, I want to get off this issue of sort of the theology of whether the common law employer could escape liability, because what we have here is a statute in which everybody... A statute in a fact pattern in which everybody agrees that the service provider is liable and has funds to pay, and the question is, what is the limit on that liability? And the reason that they're liable is because the tax is imposed on the employer who pays. That's in 3301. And I read the limitation on liability, which has the same wording to mean the same thing, and especially when I say, well, does the employer... Is the employer somebody who pays? And I look at the definition, and the definition says, yes, an employer who pays is defined as an employer. That's why I think I meet the statute. Your Honour, I know that I've exceeded my time. There is another issue involving variance and... Let's hear from the government, and we'll save your rebuttal time, and we'll see how this new issue works out and if it also needs a response. Okay, thank you very much. It's a very important issue as well, and I know that members of the panel are familiar with it. Okay, we'll have time for it. Thank you, Mr. Yeltsin. Mr. Hurta. May it please the Court, Patrick Hurta for the United States. Let's assume that they're wrong. The common law employer is still liable even if they hire a service provider. The cap applies on a $7,000 per employer basis to the common law employer. Why shouldn't we have a system where if you choose to sue the service provider, you have to go on a $7,000 per service provider cap, whereas if you choose to sue the common law employer, then it's a $7,000 per common employer. Do you understand the question? Yeah, I understand your question, and I understand that that was the crux of your question before Judge Dyke. I think that the answer to that is really the structure of FICA and HUD and how employers are treated differently than employees. There's no indication that Congress intended that employers could aggregate in the same way as employees. Remember, an employee, of course, is just taxed on the total amount they receive from all employers over the course of the year. Congress has not said the same thing in terms of employers, as you yourself pointed out. Absolutely. So if you choose to go after the common law employer, they're liable. There's only a $7,000 cap per employer. They know the tax that you're trying to collect from the service provider. I'm willing to assume that. The problem that I have is if you elect to go after the service provider, why are we reading employer to mean service provider in one place in the statute and reading employer to mean common law employer in the other provision of the statute? Because the way the wages are defined in the statute, wages are, of course, remuneration from employment, and employment is defined as common law employment. So how do we get to these two different employers? Well, that actually goes back to the Supreme Court's decision in Ott, which my friend talked about. The Supreme Court decision in Ott basically grafted the 3401D1 employer onto the person who's responsible for reporting and remitting taxes for FICA and FUTA. Now, that's important because... But under the withholding provision, the common law employer is relieved of liability if there's a service provider. Well, that's true, but remember in 3401D1, the statutory employer provision actually has the exception for the calculation of wages, and that's what's at issue here. That's why you have two different employers. You have the employer who's responsible for reporting and remitting, which in this case would be the statutory employer, and then you have the employer for purposes of determining the liability. And that's what the United Circuit recently said in Blue Link, is that important thing, that the common law employment relationship is the trigger for FUTA and FICA liability, not the statutory employer relationship. And that's precisely why you should look at the common law employer rather than the statutory employer when you're saying, is it the aggregator's liability or all of these different employers that the employee works for? But you're asking that we make a leap that's quite unusual, right? I mean, we're talking about back-to-back statutory provisions which use the same terms, and you're saying in one we should assume Congress intended a statutory employer, in the other a common law employer. That's a leap, right? Well, I think it's a leap, but I think it's a leap that's justified as the Ninth Circuit found in Blue Link. This is the same point that was raised in that court. Now, the reason why it seems like a leap is because, again, the Supreme Court's decision at an opt. There was no equivalent provision, as Judge Dyke pointed out, to 3401D1 in FICA and FUTA. Remember, it was grafted on by the Supreme Court, and the Supreme Court was only talking about reporting and remitting on it. There's no indication that they wanted to make the further leap into changing the fundamentals of how employment tax is calculated, in which, you know, each common law employer is liable up to the wage base on the amount of remuneration that employer has paid. There's no support that ought to be given that great leap forward. And the reason is because ought just basically imported the withholding tax provision, and it makes sense because what the Supreme Court was concerned about in ought was to make sure that the person who was in charge of the payment of the wages was the entity that was actually remitting the tax. It wouldn't make any sense for the common law employer who hires an aggregator or a payroll servicing company to do the payroll and then also to try to calculate the tax and remit the tax. That's why you hire a payroll servicing company. And so the government's position would be the same under the scenario I posed to your friend, which is if Congress decided to get a progressive FICA tax and exempt the first $50,000 of income from the payment of that tax for purposes of the employer, then the IRS would be saying, as it's saying here, that aggregation is not the way we calculate. That's precisely right. Aggregation is not an option here. It's, again, what is offered to an employee. That's why an employee is only taxed once, but Congress decided to go a different way with employers. So how does this work in practice? It doesn't seem to have been an issue between the parties, but these employees, are they selected by the production company or are they provided if they need somebody to do this or that from some sort of pool handled by this appellant? I believe that these employees are selected by the production companies, and then they're put on the payroll of the payroll servicing company. So Entertainment Partners is the person who signs their checks, but in terms of the common law employers, that's the production companies, and the question is whether it's studios or single production entities. That's another question, but the production companies control their employment, which is actually a settled fact in this. It was one of the settlement issues in the Settlement and Court of Federal Claims. Just to follow up to Judge Newman's question, your traditional temp agency that some of us are familiar with dating back 40 years, I mean, there it seems like the employer is, I mean, the temp agency plays much more of a role as the traditional employer, right, than the facts here seem to suggest. I think that that's right, and in some cases there will be a question of who is the common law employer. In this case, there is no question who is the common law employer. That's, again, a settled fact. It doesn't seem that different from the temp agency situation. The temp agency hires the person, sends it over, let's say, to the law firm. The law firm directs the employer, how to perform the duties, so it must be that the law firm is the common law employer, right? Yes. Well, I mean, as you know, Judge, the common law employer test is a multi-factor test, but control and directing is the number one important factor in it. So, yes, I think that most times the law firm, in your hypothetical, would be the common law employer. I had a question about this 2009, unless my colleagues had other questions about this aspect. I'm trying to figure out how the statute of limitations works here. As I understand it, let's assume that we were not in a partial payment situation, that there had been no partial payment and no lawsuit, that it would be true, would it not, that if there was a levy in 2009 and a suit to get the amount back from the levy in a refund suit, that they could raise any issue they wanted to in that refund suit. They wouldn't be barred by what was discussed during the deficiency assessment, right? I think that that's right now. Right, under the Allstate case. Okay, so what's different about this where there has been a partial payment in a refund suit? I mean, they're certainly bound as to what they said in the refund suit with respect to the partial payment. I'm not talking about that. But the 4.3 or whatever it was that was not the subject of the initial refund claim, why is it that they can't raise the issue of independent contractor in connection with that? Well, that actually goes back to the type of refund suit that's at issue, Judge Dike. It's a divisible tax refund suit, so as you say, it's a partial payment. But that's really just a way around the full payment rule of FLORA. It's an advantage for the taxpayer. Sure, I understand that. But when that partial payment is made, there's no agreement between the taxpayer and the IRS as to how the rest of it is going to be handled, right? Well, there's no agreement, but it really is at this point in time pro forma. A partial payment for each of the periods at issue is made, and then the IRS counterclaims without introducing any new issues, just so that the entire liability can be determined at one time. So why are they barred from raising the independent contractor question with respect to the refund suit based on the levy? Well, in 2009, those amounts were already at issue. So those amounts were actually applied to—or not applied, but they went to— Is the government's filing of the counterclaim that's the critical element? Well, I think that it's the type of refund suit at issue. I think the fact that it's a divisible tax refund suit in which the government does file a pro forma counterclaim, that is—you're right—that's what's the most important factor. Once everything is at issue— So if the government hadn't filed the counterclaims, then they would be able to raise the independent contractor thing with respect to the 4.3? I think that that's right, but that 4.3 million is at issue. So there's already, quite frankly, a judicial determination that's going on about that fiscally. So the theory is that once that's happening, they can't add another basis for their defense other than what they've asserted in the lawsuit in response to the government's counterclaim. That's totally right, Ernie. And it's—you know, obviously, that levy claim— or the levy refund action only had to do with the $4.3 million. Certainly can't bootstrap it for the rest of it, but even on that $4.3 million, it was already at issue. And the determination here will resolve that $4.3 million. So you can't refund since it's already at issue. There doesn't seem to be any authority on this, right? No, it's kind of a gray area of the law because usually on these divisible tax refund claims, everyone accepts everything is at issue. And so, you know, sometimes there are collection matters proceeding, but then they're all wrapped into that original divisible tax refund claim. Well, in those partial payment situations, would it be typical for the taxpayer and the IRS to agree between themselves that the outcome of the rest of it would depend on the resolution of a partial payment? Well, that's exactly what these cases are about. But there was—I don't see that there was such an agreement here. Well, there's no official agreement. It's just the way around the full payment rule of the floor. Is there usually a formal agreement? No. It's just, for example, in the 6672 responsible person context, I've had a couple of those cases in which, again, the parties— the plaintiff puts at issue each of the quarters that are issued in the assessment and then the government automatically comes back and puts the remainder of the assessment at issue. So it's just kind of a lockstep in the divisible tax area. And, of course, just to get away from the 2009 claim for a moment, the other part of the Court of Federal Claims ruling is subject to an abuse of discretion standard. So when the— The delay? Right. When the court held that they couldn't introduce the independent contractor argument six years down the line, having known about it since the 1990s, that was well within the court's discretion, especially because there had been a scheduling order, there had been settlements. The plaintiffs had multiple opportunities to introduce that issue, which they didn't. And it wasn't an abuse of discretion for the Court of Federal Claims to preclude them from raising it at such a late date. This court's Bank of America decision is right on point. So if there are no further questions, I'd ask this court to affirm the CFC's judgment. Okay. Thank you. Thank you, Mr. Arda. Mr. Yalowitz? Thank you, Your Honor. I very much appreciate the court's indulgence on the time. I want to address four things. The first thing is I want to come back to Judge Dyke's question about the liability of the common law employer. I don't want to re-debate it. I just want to give the court the citation to the case I was mentioning, which is called General Motors. The citation is 91-1, U.S. Tax Court, paragraph 50-032, and I cite it on page 15 of my reply brief. So that case deals with the way that ought and the withholding statute relate to FICA and FUTA, and I think it's informative. One nuance I want to mention here in this regard is that the withholding statute is structured a little bit differently than FICA and FUTA. The withholding statute calls wages remuneration for services provided to the employer, and so they have to separate. When you've got this statutory employer, they have to say that wages don't mean that statutory employer because otherwise you'd have sort of a renvoi within the statute, but in FICA and FUTA, they have three relevant definitions, employer, wages, and employment, and wages has to do with the remuneration, and if you look at all the exclusions, they're all things where there's a payment being made, and then employment is services in a common law relationship, and if you look at the exceptions, they all deal with status, like you work for an Indian nation, which was what the Blue Lake case was about. So a case like Blue Lake, this is the second thing I wanted to address, Blue Lake was really about the definition of employment, not about the definition of wages. That's the second thing. The third thing is I wanted to come to the 2009 refund claim that the court was asking about. This 2009 claim that I had to file was required. I couldn't get that $4.3 million back without filing that claim. The only way to get the $4.3 million was to file that claim, and once I was filing the claim, it was within the statute of limitations, it was within the two years, I was allowed to bring any ground I wanted, and I was allowed to file it either in the Court of Federal Claims or in District Court. By filing in the Court of Federal Claims, I didn't waive my right to argue what I was arguing before. It's the same claims, same grounds, that I could have made in District Court. Do you agree with the government that there's no authority directly in appointing about this? No. In what case? I refer to the government's brief in the Klein case. The government would love to think that the briefs are authoritative. Well, they won the case. What judicial is this? Well, really Allstate, Your Honor. Allstate talks about... In Allstate, there was a second claim while litigation was pending, and the court said that you couldn't amend the original claim because there had been a case that started. But the new claim was within the statute of limitations. It was viable. And this court, in relatively recent years, followed Allstate in the Computer Vision case, which I think, Your Honor, authored, if I remember correctly. So an amendment... Everybody agrees it's too late to amend that O2 claim, but the new O9 claim is most certainly viable and includes the independent contractor. Then, what the government is really doing here, and this is my last point, is they're... Well, that's my third point, I'm sorry. Is they're mushing together the O9 claim with recoupment. And they're saying, well, it's a divisible tax, and so, therefore, you're not allowed to raise recoupment. And the answer to that is that there are no judge-made exceptions to recoupment. The Supreme Court in Beach v. Ocklin, which I cite in my reply brief, says recoupment is always available unless Congress says it's not. And then the fourth thing I'd like to address, just briefly, is this idea of delay, which doesn't go to the O9 claim. The judge said the O9 claim was perfectly timely, but on the recoupment issue, he said, well, even if I'm wrong on recoupment, I'm going to call a foot fault. And the problem with the foot fault is, he said in 2010, oh, you shouldn't have raised this two years earlier. And he supervised discovery all along for two years. I was in this courthouse every month talking to the judge about independent contractors and quantifying that overpayment. And then two years later, he says, oh, you know, you shouldn't have raised that two years ago. That's not, it's not cricket. And the government's delay in raising the undue delay defense is a forfeiture. Where did the CFC say that, with respect to the 2009 recoupment claim, that there was no delay problem? If you'll bear with me a moment, Your Honor, I can find it. Do you have it? You could just send a letter. We'll send you a letter. We'll give you the page. I don't need to argue it. He said it. All right. Okay, thank you so much. Your Honor, thank you. Mr. Eerder, the case is taken under submission. That concludes the argued calendar for this morning. All rise.